DYNAMICS CLASSICS, LTD., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 81–7–00938

Before RAO, *Judge.*

(Decided October 17, 1986)

*Weltz Stendina & Posner (Herbert T. Posner* at the trial and on the brief) for plaintiff.

*Richard K. Willard,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Civil Division, Department of Justice *(Susan Handler-Menahem* at the trial and on the brief) for defendant.

RAO, *Judge:* The merchandise involved in this civil action was imported through the port of New York and invoiced as "exercise

---

[5] Alternatively, administrative reviews under section 751 could proceed, but if plaintiffs' position were adopted, the results of such reviews might turn out to be meaningless, depending upon the final decision in the pending court action challenging the countervailing duty determination.

suits." The Customs Service (Customs) classified the merchandise under item 772.30 of the Tariff Schedules of the United States (TSUS) as "wearing apparel not specially provided for, of rubber or plastics."

The plaintiff claims that the merchandise is properly classifiable under item A774.55, TSUS, as "other articles not specially provided for, of rubber or plastics." Plaintiff's motion to admit into evidence the affidavit of Dr. Joseph Aisner, offered at the trial of this action, as an exception to the hearsay rule, is also before the court.

The "exercise suits" consist of top and bottom pieces composed of polyvinyl material having a uniform thickness of 0.1 MM. The top has a neck opening and long, sleeve-like extensions, and both the neck and sleeve openings are partially drawn up with an elastic-like closing. Some of the tops have pockets and racing stripes of different colored plastic on the sleeves. The bottoms are elasticised at the waist and at the legs, which extend to the ankles.

It is plaintiff's position that the merchandise cannot be regarded as wearing apparel because the exercise suits are not chiefly worn for purposes of decency, comfort and/or adornment; and that they are special purpose devices designed to seal in body heat. It claims that for Tariff Schedule purposes, the term "wearing apparel" is limited to articles used as a covering or protection against the elements, or as items of personal comfort or adornment, as enunciated in *Antonio Pompeo v. United States*, 40 Cust. Ct. 362, 366 C.D. 2006 (1958); and *United Merchandising Corp. v. United States*, 44 Cust. Ct. 420, 421, Abs. 64074 (1960).

Defendant's position is that the exercise suits are of the class or kind of merchandise included within the definition of "wearing apparel," which includes all articles designed to be worn, so long as they are not used for protection against injury.

The parties agree that the ultimate test of whether an article is to be considered wearing apparel depends on its use, citing *Admiral Craft Equipment Corp. v. United States*, 82 Cust. Ct. 162, 164, C.D. 4796 (1979).

The issue for the Court is whether the merchandise is "wearing apparel" for Tariff Schedule purposes. If the merchandise falls within the definition for wearing apparel, plaintiff cannot prevail, since it will not have borne its burden of proving the impropriety of the provision under which it was classified, since it is presumed that Customs found all the factual elements necessary to support that classification. *W.A. Gleeson v. United States*, 58 CCPA 17, C.A.D. 998, 432 F.2d 1403 (1970).

To establish the chief use of a class or kind of merchandise, the following factors must be considered: (1) the general physical characteristics of the merchandise; (2) the expectations of the ultimate purchaser, (3) the channels of trade, and (4) how it is advertised and use. *United States v. Carborundum Co.*, 63 CCPA 98, 102, C.A.D. 1172, 536 F.2d 373.

The general physical characteristics of the merchandise are evidenced from an examination of a sample of the exercise suit *in camera* and from the testimony of plaintiff's witness, Professor Zamkoff, former Chairman of the Apparel Department at the Fashion Institute of Technology, New York, New York. It was his opinion, after examining a sample of the merchandise, that it was not wearing apparel, but merely a piece of equipment (R. 66). It could not be considered active sportswear because it restricts freedom of movement of the neck area because of the neck closure (R. 70) and because of the material used in its manufacture (R. 70, 71). Sportswear would be constructed from fabrics that are absorbent, light (for sports such as swimming) or heavy for sports such as mountain climbing. The lack of absorbency of the polyvinyl used to manufacture the merchandise would keep it from consideration as active sportswear, in Professor Zamkoff's opinion. The court's examination of the sample of the merchandise also leads to the conclusion that the exercise suit, by inhibiting or completely blocking the absorption of perspiration into the fabric and ultimately into the atmosphere, would cause the article to become uncomfortable in most sports after more than half an hour of activity.

The evidence of record concerning the expectations of the ultimate purchaser was mainly received through the testimony of Sharon Illg, who purchased the exercise suits for use in "body wrapping" in Louisiana. She owns two body wrapping shops and is familiar with other such establishments in California, Kentucky, and 21 other states and in Canada. The procedure used in body wrapping involves the application of warm cloths or bandages that have been steeped in herbs, minerals and salt to the portions of the body for which weight and girth loss is desired and the subsequent wearing of an exercise suit by the person who desires to lose weight and inches, for approximately one hour. Generally, this regimen results in the loss of from three to twelve inches from the body and the person is urged to purchase an exercise suit for home use in a weight maintenance program. (R. 58–58). When her customers asked her if they could use the exercise suit to jog in, she said "No, because it would be potentially dangerous." (R. 59). Another witness, Robert Timinski, testified that he had attempted to exercise in a similar exercise suit and found that it was uncomfortable. It was not cut fully enough and it induced heat too quickly (R. 97).

As to the channels of trade in which the merchandise travels, plaintiff adduced testimony that it was sold to department and sports supply stores throughout the country. Mr. Timinski testified that he was the Vice President of Soft Goods Merchandising for Herman's World of Sporting Goods for 106 stores throughout the country. (R. 87). The merchandise in question is handled by the sporting goods buyer and not the sports apparel buyer. David Richman, Vice President of Sales for plaintiff, testified that the exercise suits are sold to the finest department and sports equipment stores in the

country through the buyers for those stores of physical fitness equipment or notions. (R. 9-10). Within the stores themselves, the articles are sold in sports equipment, physical fitness or notions departments. They are not placed with the sports apparel, although the sports apparel department may, in some instances, be in close proximity. The merchandise is sold in boxes, whereas most sports apparel is exhibited on hangers. Although most apparel has some sort of security device to prevent shoplifting, the instant merchandise is not so protected.

Plaintiff's witnesses also testified that the exercise suits were advertised and offered for sale with sports equipment rather than with sports apparel. Defendant established that in some instances the advertisements of the merchandise depict them being used in exercise situations. Indeed, the package in which the articles are sold was introduced into evidence by defendant and contains instructions to the effect that the exercise suits can be used for exercise, housework, or play:

> Wear it while you work, play, or exercise. Do housework in it, relax in it, read a book or watch TV in it. Wear it over a swimsuit, playsuit or any cotton clothing.

These instructions are antithecal to plaintiff's position, and contradict to some extent the testimony of witnesses at the trial that the merchandise could not be worn for exercise for long periods of time without a risk to the health of the wearer, and the court has considered this aspect of defendant's offer of proof.

The testimony produced by the plaintiff at trial tended to prove that the merchandise was designed for weight reduction purposes and that the effect of wearing the exercise suit was a "sauna" effect. That is, it builds up body heat by not permitting perspiration to evaporate from the body's surface. Its witnesses testified that the merchandise was used for a specific purpose—to cause weight loss by the sealing in of body heat causing the excretion of excess fluids from the body.

The term "wearing apparel" has been judiciously defined by the Supreme Court in *Arnold* v. *United States*, 147 U.S. 494, 496, (1892). There it was held that the term "wearing apparel" is used in an inclusive sense as embracing all articles which are ordinarily worn—dress in general. And our appeals court, in *Guthman* v. *United States*, 1 CuApp 170, TD 31214, *aff'g* T.D. 29629, determined that the term "wearing apparel" embraces all articles which are ordinarily worn—dress in general. These definitions were somewhat clarified in *Antonia Pompeo* v. *United States, supra*, in which it was held that the term wearing apparel includes articles worn by human beings for reasons of decency, comfort or adornment, but does not include articles worn as a protection against the hazards of a game, sport or occupation. And, in *Jack Bryan, Inc.* v. *United States*, 72 Cust. Ct. 197, 204, C.D. 4541 (1974) the Court stated that the term

wearing apparel is generic or descriptive and that under prior tariff acts it was held to mean all articles of wearing apparel worn by human beings for reasons of decency, comfort and adornment.

In *DAW Industries, Inc.* v. *United States,* 1 Fed. Cir. 146, 150 (1983), the Court of Appeals for the Federal Circuit considered whether a nylon sheath worn on the stump of an amputee's residual limb and a wool "sock" that fits over the sheath were wearing apparel or other orthopedic articles and stated:

> The CIT and the parties concentrated their discussions of this issue on case law which maintains that some articles that are worn may nevertheless not be wearing apparel due to their special uses and characteristics. *Admiral Craft Equipment* developed the standard that items are not wearing apparel that go "far beyond that of general wearing apparel." While it is abundantly clear that the sheaths and socks are used exclusively with protheses and that they are useless otherwise, it is not entirely clear that they provide significantly more, or essentially different, protection than analogous articles of clothing. Virtually all wearing apparel is to a degree (often a high degree) designed and worn to provide comfort and protection, often for very specific situations. The sheath and socks differ incrementally rather than in kind from other wearing apparel. While the increment may become so very large in some cases that the article is no longer wearing apparel, this is not such a case. [Footnotes omitted]

The reasoning of our Court of Appeals is certainly appropriate in this case. While the exercise suits may provide the same protection from the elements, protect the decency of the wearer and may even be said to adorn the body, they are chiefly used for very specific situations. The increment in the difference in use and effect between the merchandise at hand and other sportswear is so large that the article is no longer wearing apparel. The specific situation in which the exercise suits are chiefly used, as established by the evidence at trial, is the retention of body heat because of the nonabsorption of body fluids because of the plastic material from which the articles are constructed. Sportswear, on the other hand, is generally constructed of fabrics which permit the absorption of perspiration and its subsequent evaporation, resulting in cooling the body during exercise, rather than retaining the heat for weight reduction.

After an examination of the merchandise, relevant case law and the testimony of record, it is the determination of the court that the plaintiff has overcome the presumption of correctness that attaches to the government's classification and that it has established that the merchandise at issue is not wearing apparel and the protest is sustained.

Plaintiff's motion to admit Dr. Aisner's affidavit at trial as an exception to the hearsay rule under Rule 803(4) of the Federal Rules of

Evidence is denied, as that rule is inapplicable in this case. Rule 803(4) excepts from the hearsay rule:

> Statements for purposes of medical diagnosis or treatment and describing medical history or past or present symptoms, pain or sensations or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

First, plaintiff did not establish that the attendance at trial of Dr. Aisner, a resident of the United States, could not be had.

Second, the rule applies to statements made for purposes of diagnosis or treatment of a patient, and describing his or her medical history or past or present symptoms on the theory that a patient has a strong motivation to be truthful to a physician about such matters. Dr. Aisner's statements do not relate to specific patients but relate only to his opinion as to the medical use of the exercise suits for whole-body hyperthermia and there is no recognized body of literature that connects hyperthermia to cancer treatment as he attempts to do. Therefore, Dr. Aisner's affidavit is inadmissible into evidence.

So ORDERED.